**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JAMES NELSON, an individual,

Plaintiff,

vs.

CHARTER TOWNSHIP OF MILFORD, a Michigan charter township,
THOMAS MOORE, in his individual and official capacities,
CHAD SCIME, in his individual and official capacities,
MARTIN COOK, in his individual capacity,
JOSEPH BONISH, in his individual capacity, and
MILFORD TOWNSHIP FIRE FIGHTERS, IAFF LOCAL 5481,
a labor organization,

Defendants.

Case No. ____________

Hon. ____________

_______________________________________________________________/

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, JAMES NELSON, by and through his attorneys, DILLON & DILLON, P.L.C., hereby makes the following Complaint and Demand for Jury Trial:

## COMPLAINT

## JURISDICTION, PARTIES, AND VENUE

1. Plaintiff JAMES NELSON ("Plaintiff" or "NELSON") is an individual residing in Annandale, Fairfax County, Virginia. At all times relevant to this Complaint, until in or about August 2026, Plaintiff resided in Milford, Oakland County, Michigan.

2. Defendant CHARTER TOWNSHIP OF MILFORD ("Defendant Township" or the "Township") is a Michigan charter township located in Oakland County, Michigan. The Township operates the Milford Fire Department (the "Department") from its principal station at 1100 Atlantic Street, Milford, Michigan 48381.

3. The Milford Fire Department is not a separate legal entity. It is a department of the Township, and the Township is Plaintiff's employer.

4. Defendant THOMAS MOORE ("Defendant Moore" or "Chief Moore") is an individual who, at all times relevant to this Complaint, was the Fire Chief of the Milford Fire Department. Chief Moore exercised supervisory authority over Plaintiff, including the authority to discipline Plaintiff, place him on leave, and determine the terms and conditions of his employment. Upon information and belief, Chief Moore was the Township's final policymaker with respect to personnel decisions within the Department. He is sued in his individual and official capacities.

5. Defendant CHAD SCIME ("Defendant Scime" or "Assistant Chief Scime") is an individual who, at all times relevant to this Complaint, was the Assistant Fire Chief of the Milford Fire Department. Assistant Chief Scime exercised supervisory authority over Plaintiff and personally issued the directives placing Plaintiff on administrative leave, compelling him to submit to medical

examinations, and removing his pay. He is sued in his individual and official capacities.

6. Defendant MARTIN COOK ("Defendant Cook" or "Captain Cook") is an individual who, at all times relevant to this Complaint, was a Captain in the Milford Fire Department, Plaintiff's shift captain on the Red Shift, and President of IAFF Local 5481. He is sued in his individual capacity.

7. Defendant JOSEPH BONISH ("Defendant Bonish" or "Lt. Bonish") is an individual who, at all times relevant to this Complaint, was a Lieutenant in the Milford Fire Department with supervisory authority over Plaintiff, and Secretary of IAFF Local 5481. He is sued in his individual capacity.

8. Defendant MILFORD TOWNSHIP FIRE FIGHTERS, IAFF LOCAL 5481 (the "Union" or "Local 5481") is a labor organization and the exclusive bargaining representative of the Township's full-time firefighters, including Plaintiff, within the meaning of the Public Employment Relations Act, MCL 423.201 et seq. ("PERA"), the Elliott-Larsen Civil Rights Act, and the Persons with Disabilities Civil Rights Act. The Union conducts its business in Oakland County, Michigan.

9. This Court has jurisdiction over the federal claims asserted herein pursuant to 28 U.S.C. §§ 1331 and 1343. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367 because

those claims form part of the same case or controversy as the federal claims.

10. The unlawful employment practices complained of in this Complaint occurred within the Eastern District of Michigan, all Defendants reside or conduct business in this District, and venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 42 U.S.C. § 2000e-5(f)(3).

## ADMINISTRATIVE EXHAUSTION

11. On April 27, 2026, Plaintiff filed a Charge of Discrimination with the United States Equal Employment Opportunity Commission ("EEOC"), dual-filed with the Michigan Department of Civil Rights, against the Township and Chief Moore, Charge No. 471-2026-05047 (the "Charge"). The Charge alleged discrimination on the basis of actual and perceived disability, harassment, and retaliation, and described the conduct set forth in this Complaint. The Statement of Charge attached to the Charge described, among other things, the sex-based slurs directed at Plaintiff, the ridicule of his actual and perceived mental health, Plaintiff's repeated complaints to command officers, Chief Moore's directive that no one complain above him, the compelled psychological examination, and the Township's retaliation.

12. The Township submitted a Position Statement in response to the Charge on June 12, 2026.

13. On July 30, 2026, the EEOC issued a Determination and Notice of

Rights to Plaintiff. This Complaint is filed within ninety (90) days of Plaintiff's receipt of the Notice of Right to Sue.

14. Plaintiff's claims under the Family and Medical Leave Act, 42 U.S.C. § 1983, and Michigan law do not require administrative exhaustion.

## GENERAL ALLEGATIONS

### A. Plaintiff's Exemplary Service

15. Plaintiff James Nelson is a 38 year old firefighter and Emergency Medical Technician licensed by the State of Michigan and certified by the National Registry of Emergency Medical Technicians.

16. The Township hired Plaintiff as a paid-on-call firefighter on May 15, 2019, and hired him as a full-time Firefighter/EMT on or about April 19, 2023.

17. Plaintiff is a non-probationary member of the bargaining unit represented by the Milford Township Fire Fighters, IAFF Local 5481. His employment is governed by a collective bargaining agreement between the Township and Local 5481 effective January 1, 2025 through December 31, 2027 (the "CBA"), which Chief Moore signed on the Township's behalf.

18. Article 10 of the CBA permits the Township to discipline or discharge non-probationary employees only for just cause, and identifies suspension without pay as a form of discipline.

19. Under the CBA, Plaintiff's 2026 base salary is $75,705.00 per year. He is also entitled to overtime, an employer contribution of twelve percent (12%) of base wages to a defined-contribution retirement plan, and other benefits.

20. Throughout his employment, Plaintiff has been an exemplary firefighter. He has never been disciplined.

21. On April 20, 2023, the Department awarded Plaintiff a formal commendation for his rapid response, on-scene care, and decision-making in treating a patient suffering a STEMI heart attack, which resulted in a favorable patient outcome.

22. In his October 10, 2023 performance evaluation, Plaintiff's supervisor rated him "Exceeds Expectations" in Communication Skills, Cooperation and Teamwork, and Training and Development, and "Meets Expectations" in every other category. The evaluation described Plaintiff as "a true team player" who "always volunteers for the tough assignments," noted that he had completed Pump Apparatus Operator, Fire Instructor I, and Fire Officer I certifications while pursuing a Fire Science degree, and described him as "a vibrant and engaging instructor" on the Department's Certified Instructor Team.

23. On July 29, 2024, Plaintiff underwent a complete physical examination, which found him physically and mentally fit to perform all essential functions of a firefighter.

24. In or about 2024, Plaintiff responded to a call involving a gunshot suicide attempt. Detecting a pulse, Plaintiff rendered aid consistent with his training. Despite his efforts, the victim did not survive.

25. Thereafter, a member of the Department, without authorization and without Plaintiff's knowledge, accessed Milford Police Department body-camera footage of Plaintiff's response. Plaintiff then became the subject of ridicule within the Department - not for any failure in his care, but for "performing CPR on a dead body."

26. The trauma of that call, compounded by the ridicule that followed, caused Plaintiff to develop a trauma-related behavioral health condition.

**B. Plaintiff's 2025 FMLA Leave and Medical Clearance**

27. In June 2025, Plaintiff requested medical leave to obtain treatment for the trauma-related behavioral health condition described above (the "Condition"). The Condition is a mental impairment that, when active, substantially limits one or more major life activities, including concentrating, thinking, sleeping, interacting with others, and the operation of neurological and brain functions.

28. On June 23, 2025, the Township issued a Designation Notice under the Family and Medical Leave Act approving Plaintiff's leave for his "own serious health condition" and designating the period of June 9 through August 4, 2025 as FMLA leave.

29. From June 19, 2025 through August 14, 2025, Plaintiff participated in and successfully completed the residential treatment program at the International Association of Fire Fighters ("IAFF") Center of Excellence for Behavioral Health Treatment and Recovery, a program designed specifically for firefighters.

30. Upon discharge, the IAFF Center of Excellence cleared Plaintiff to return to work with no restrictions on August 18, 2025. Plaintiff provided the Township with written verification of his completion of treatment and his clearance.

31. The Township accepted that clearance and returned Plaintiff to full duty on or about August 18, 2025.

32. From that point forward, the Township, Chief Moore, and Assistant Chief Scime knew of Plaintiff's Condition, his treatment for it, and his record of having it.

33. Following his discharge from the IAFF Center of Excellence, Plaintiff continued outpatient treatment with Kristen N. Moore, LMSW, a clinical social worker licensed by the State of Michigan (License No. 6801098511) and practicing in Highland, Oakland County, Michigan. Ms. Moore is trained in trauma-focused modalities, including Accelerated Resolution Therapy, Cognitive Behavioral Therapy, and Dialectical Behavioral Therapy. Ms. Moore is not related to Defendant Thomas Moore.

34. Ms. Moore was known to the Department, and the Department to her. With the Department's knowledge, Plaintiff was working with Ms. Moore to help create a Peer Support Program for Milford firefighters.

35. Following his return, Plaintiff continued to perform all duties of his position without incident. On November 4, 2025, he passed his annual SCBA respirator fit test.

36. After his treatment, Plaintiff made changes to protect his health and recovery, including ending his off-duty association with co-workers whose conduct he believed was inconsistent with that recovery such as co-workers' abuse of steroids and alcohol.

## C. Harassment Based on Disability and Sex

37. Beginning in or about 2024 and continuing on a near-daily basis through March 2026, and intensifying after Plaintiff's return from treatment in August 2025, Plaintiff was subjected to repeated, unwelcome harassment by his supervisors and co-workers.

38. Chief Moore repeatedly mocked Plaintiff by making slurred "mocking noises" and speaking in garbled words in Plaintiff's presence, imitating and ridiculing a person who is mentally impaired, and directed this ridicule at Plaintiff because of his Condition and his record of treatment.

39. Chief Moore asked Plaintiff whether he was gay because Plaintiff had

chosen to eat a healthy diet, and asked Plaintiff whether he was looking at "gay porn" while Plaintiff was writing incident reports.

40. Supervisory personnel and fellow firefighters repeatedly called Plaintiff "faggot," "queer," "homo," "pussy," "retard," and "weak." They also subjected Plaintiff's work to disproportionate scrutiny and unwarranted criticism.

41. These slurs were directed at Plaintiff because of sex, including because of his actual or perceived sexual orientation and because he was perceived as failing to conform to sex stereotypes of how a male firefighter should look, eat, act, and speak.

42. The slurs "retard," "weak," and "pussy" were directed at Plaintiff because of his Condition and his having sought treatment for it.

43. Plaintiff did not solicit or invite this conduct and regarded it as offensive and humiliating. Plaintiff repeatedly raised the harassment with command officers, including Chief Moore, and asked that it stop.

44. Because Chief Moore, the Department's highest-ranking officer, personally participated in the harassment, the Township had actual knowledge of it. The harassment by supervisors occurred openly in the station, such that the Township knew or should have known of it, yet the Township took no action to stop it.

45. Chief Moore told Department members that complaints were to be

made only to him, that he was in effect the Department's human resources department, and that anyone who went above him to Township personnel "won't work here anymore."

46. Chief Moore's directive contradicted the Township's written anti-harassment policy, which permits employees to report harassment to the Township Supervisor or any member of the Township Board. It deterred Plaintiff and others from reporting harassment outside the Department, under threat of losing their jobs.

47. Although Plaintiff's complaints were known to command officers, including Chief Moore, the Township never investigated them, and the harassment continued unchecked.

48. The Township's Personnel Policy and Procedures Manual, effective March 1, 2020, requires that all complaints of discrimination and harassment "be referred immediately to the Township Supervisor" and promises "[a] prompt and thorough investigation." Chief Moore did not refer Plaintiff's complaints, and the Township did not investigate them.

49. The Township first offered to investigate on April 27, 2026. That was years after the harassment began, after Plaintiff had retained counsel, and on the day he filed his EEOC Charge. The Township proposed to conduct the investigation through its outside litigation counsel and never defined its scope.

**D. The March 30, 2026 Incident**

50. On the morning of March 30, 2026, while Plaintiff was seated completing work-related tasks, Lieutenant Joseph Bonish approached him and asserted that Plaintiff had completed a truck check incorrectly.

51. Plaintiff respectfully explained that the check had been completed and documented in the Department's application, and attempted to show Lt. Bonish the documentation. Lt. Bonish raised his voice and did not permit Plaintiff to explain.

52. Plaintiff asked for a moment to step away. Lt. Bonish followed Plaintiff into the apparatus bay and continued to confront him. Plaintiff clearly stated that he needed to be left alone, and Lt. Bonish continued to follow him as he walked toward his vehicle.

53. Upon information and belief, the confrontation was recorded by video cameras in and around the station.

54. To de-escalate the situation, Plaintiff left the station and promptly notified command by email that he was ill and needed to leave. Chief Moore approved Plaintiff's request to take the remainder of the day off.

55. Following the incident, Plaintiff experienced a stress reaction lasting several hours. Consistent with the wellness plan developed through his IAFF treatment, Plaintiff responsibly contacted support resources and scheduled an appointment with his treating therapist for April 2, 2026.

56. Plaintiff's conduct complied with the CBA. Article 34 allows personal leave for an employee's own sickness without advance notice. Article 26 directs an employee taking prescribed medication that may affect performance to request a leave of absence. Plaintiff did both.

57. On April 1, 2026, Plaintiff sent Chief Moore an email formally documenting the March 30 incident, describing Lt. Bonish's conduct, requesting that the matter be reviewed "to ensure appropriate communication and leadership practices are upheld," and stating that he remained committed to performing his duties.

58. Ms. Moore, Plaintiff's treating therapist, had assessed Plaintiff and determined that there was no impediment to his continuing to perform his duties.

**E. The Unauthorized Fitness-for-Duty Examination**

59. On April 2, 2026, the day after Plaintiff's email complaining about Lt. Bonish's conduct, Assistant Chief Scime issued Plaintiff a "Notice of Fitness for Duty Examination and Placement on Paid Administrative Leave."

60. The April 2 Notice removed Plaintiff from duty, barred him from the station, and directed him, "as a condition of [his] continued employment," to submit to a fitness-for-duty evaluation by a physician selected by the Department, Dr. Joseph Zambo, on April 8, 2026, under threat of discipline "up to and including termination of employment."

61. At the same time, the Township locked Plaintiff out of his Department email and information systems.

62. The April 2 Notice did not identify any deficiency in Plaintiff's job performance, any objective evidence that Plaintiff was unable to perform the essential functions of his position, or the scope or nature of the examination to be performed. The examination was a psychological fitness-for-duty evaluation.

63. The Township's own Personnel Manual permits a fitness-for-duty examination only "according to strict procedures" and only where "the examinations are job related and consistent with business necessity." Plaintiff asked the Township to identify the policy or contract language that authorized the examination. The Township failed and refused to produce any.

64. The only basis for the examination was a single stress reaction to a confrontation initiated by a supervisor, which Plaintiff managed appropriately by removing himself from the situation, using approved sick time, and seeking medical care.

65. Upon information and belief, no other Milford firefighter has been ordered to undergo a psychological fitness-for-duty evaluation at least since 2019 when Plaintiff joined the Department, including firefighters who left a shift due to illness or had disagreements with supervisors.

66. No provision of the CBA authorizes the Township to compel a

psychological examination. The CBA provides for annual physicals and health screenings (Article 20). It permits drug and alcohol testing only on reasonable suspicion based on specific objective evidence, documented in writing by the observing supervisor within twenty-four hours (Article 26). The Township's unauthorized demand for psychological examination met neither standard.

67. Lt. Bonish, who lost his temper and started the March 30 confrontation, was not ordered to undergo a fitness-for-duty examination. Upon information and belief, he was not disciplined.

68. The Township ordered the examination because of Plaintiff's Condition and his record of treatment for it, and because it regarded Plaintiff as mentally impaired. In its Position Statement to the EEOC, the Township admitted that the examination was required "considering his own description of his mental state."

69. The Township also ordered the examination because Plaintiff had repeatedly complained about harassment mocking his mental health and had requested medical leave on March 30, 2026. The examination was ordered three days after that request and one day after Plaintiff's April 1 written complaint.

70. On April 6, 2026, Plaintiff, through counsel, notified the Township in writing that he had been subjected to discrimination and harassment, including the conduct described in Paragraphs 37 through 49, and objected to the Township's

actions.

71. On April 7, 2026, Plaintiff's counsel notified Assistant Chief Scime in writing that Plaintiff would not attend the April 8 examination. Counsel gave two reasons: Plaintiff understood he had already been terminated, and the Township had never articulated a valid basis for the examination. Plaintiff's understanding was based on the Township's lockout of Plaintiff from the station and the Department's communication systems; its unauthorized and unprecedented order that he submit to a psychological examination, which continued the harassment he had endured about his mental health; and its failure, for months, to address the hostile environment of which it was aware. Plaintiff's reasons for declining the examination included the following:

a. The order was unauthorized and unprecedented. No provision of the CBA permits it, and, upon information and belief, the Township had never ordered a psychological examination of an incumbent firefighter. Submitting would have conceded that the Township could compel a mental health examination whenever a firefighter reported feeling ill - a precedent harmful to Plaintiff and to every member of the bargaining unit.

b. Plaintiff was already under the care of a licensed mental health professional, Ms. Moore, who had determined that he had no

impediment to performing his duties, and who was known to the Department.

c. The Township chose an examiner, Dr. Zambo, located in Wayne County, rather than any provider in Oakland County, where the Department and Ms. Moore are located. The Township has never explained why it selected him.

d. Because the Township had never before ordered such an examination, Plaintiff had no basis to believe that Dr. Zambo was neutral. Upon information and belief, the Township selected Dr. Zambo to manufacture a basis to remove Plaintiff from the Department.

e. Plaintiff regarded the order, issued the day after he complained about Lt. Bonish's conduct, as a continuation of the harassment he had endured about his mental health.

72. On April 14, 2026, Chief Moore wrote to Plaintiff stating that Plaintiff had not been terminated but had been placed on administrative leave, and warning that failure to attend a rescheduled examination "will result in progressive discipline up to and including termination."

73. On April 21, 2026, Assistant Chief Scime issued a "Second Notice of Fitness for Duty Examination," which acknowledged "confusion over the Township's intentions" regarding the first examination and rescheduled it for April

28, 2026. The Second Notice stated that if there were concerns with Plaintiff's ability to return to work, the Township would work with him "as it has in the past" - an express reference to Plaintiff's 2025 treatment for his Condition.

**F. Retaliation Following Plaintiff's EEOC Charge**

74. On April 27, 2026, Plaintiff filed his Charge of Discrimination with the EEOC.

75. Plaintiff did not attend the April 28, 2026 appointment for the same reasons set forth in Paragraph 71, none of which the Township addressed in its Second Notice.

76. On May 1, 2026 - four days after Plaintiff filed his EEOC Charge - Assistant Chief Scime notified Plaintiff that he was "immediately placed on an unpaid leave of absence."

77. The May 1 letter was captioned "Placement on Paid Administrative Leave," but it stopped Plaintiff's pay. Its only stated basis was Plaintiff's failure to attend the examinations. Although the letter stated that the Township would maintain Plaintiff's health insurance "at least while we attempt to resolve this matter," Plaintiff's health insurance coverage ended shortly after he was placed on unpaid leave.

78. The May 1 letter expressly referenced Plaintiff's attorney and the "claims of harassment made by your attorney," demonstrating that Defendants

were aware of Plaintiff's protected activity when they removed his pay.

79. The May 1 letter continued to bar Plaintiff from the station and from performing any departmental duties, except attending union meetings.

80. No provision of the CBA authorizes the Township to impose involuntary unpaid leave. Leaves of absence under Article 17 are granted on an employee's request, and disability leave under Article 36 is available only on the employee's written application with medical documentation. Plaintiff requested neither.

81. The May 1, 2026 action was a suspension without pay, which Article 10 of the CBA treats as discipline requiring just cause. Plaintiff was given no notice of charges, no explanation of evidence, and no hearing before or after his pay was stopped.

82. During his unpaid suspension, Plaintiff has also lost his health insurance coverage, the Township's retirement contributions, and the accrual of seniority, which Article 13 of the CBA excludes during suspensions.

83. Plaintiff has received no wages from the Township since May 1, 2026. Defendants' conduct made Plaintiff's working conditions so intolerable that a reasonable person in his position would have felt compelled to resign. That conduct included years of unchecked harassment, the refusal to investigate, removal from duty, a demand for an unauthorized, discriminatory and harassing

psychological examination, the indefinite stoppage of his pay, and the Union's refusal to help. Defendants intended that result, or it was reasonably foreseeable to them.

84. Through counsel, Plaintiff notified the Union on April 27, 2026, and the Township on June 2, 2026, that he had been constructively discharged. In or about August 2026, he relocated to Annandale, Virginia.

85. In the alternative, to the extent the Township contends that Plaintiff remains its employee, Plaintiff has been suspended without pay since May 1, 2026, and barred from the station and from performing any duties.

86. In its June 12, 2026 Position Statement, the Township asserted that Plaintiff was the "instigator" of the slurs directed at him, characterized his claims as "ridiculous," and disclaimed any knowledge of his Condition notwithstanding its approval of his 2025 FMLA leave for that Condition.

87. Before March 30, 2026, Plaintiff's job performance satisfied the Township's legitimate expectations, and he was fully capable of performing the essential functions of his position, with or without reasonable accommodation.

88. As a result of Defendants' conduct, Plaintiff has lost wages and benefits, including his base salary of $75,705.00 per year, overtime, health insurance, and the Township's retirement contributions, has suffered damage to his professional reputation and career, and has suffered severe emotional distress,

humiliation, and anxiety.

**G. The Union Abandons Plaintiff**

89. Under Article 11 of the CBA, an aggrieved employee may only discuss a dispute orally. A written grievance may be filed only by the Union, within thirty (30) calendar days of the occurrence, and "[i]f the employee or the Union does not file a grievance within the specified time limits, the grievance will be barred."

90. In early April 2026, Plaintiff asked Union representatives, including Captain Cook and Lt. Bonish, in person and otherwise, for the Union's help with the harassment he was experiencing and with his removal from duty.

91. On April 27, 2026, Plaintiff's counsel wrote to Captain Cook, as Union President, with copies to Lt. Bonish and the Union's other officers. The letter described:

- the harassment, including the slurs "retard," "queer," "pussy," and "faggot";
- Plaintiff's removal from duty and the lockout from Department systems;
- the unprecedented psychological examination; and
- the Department's refusal to produce any policy or contract language authorizing the examination.

92. The letter reminded the Union of Plaintiff's earlier request for help, stated that the Department's actions affected his bargained-for contractual rights,

and asked for the status of his grievances and the steps the Union was taking.

93. On April 28, 2026, the Union responded through its counsel and refused to act. It asserted that Plaintiff had made no request to file a grievance and had "suffered no loss of pay." It stated that it would grieve only if given "evidence that a specific provision" of the CBA had been violated. It also directed Plaintiff's counsel not to contact Captain Cook or any other member of the Union's Executive Board.

94. Three days later, on May 1, 2026, the Township stopped Plaintiff's pay. The Union's stated reason for doing nothing no longer existed, yet the Union still did nothing. It did not interview Plaintiff, take any statements, investigate, or request information from the Township. Nor did it file a grievance, within the thirty days allowed, challenging his removal from duty, the demand for unauthorized and harassing examination, or his suspension without pay, each of which violated the CBA. Upon information and belief, the Union knew of the May 1 suspension.

95. The Union's two most senior officers had conflicts of interest. Lt. Bonish had initiated the March 30, 2026 confrontation that the Township used as its pretext. Both officers were aware of, and upon information and belief participated in, the hostile environment that Plaintiff had complained about.

96. By its own admission, the Union held no membership meetings after

Plaintiff was removed from duty. Upon information and belief, Lt. Bonish unilaterally cancelled scheduled meetings by text message, without a quorum or other authority under the Union's governing rules. He did so to keep Plaintiff from attending, raising his treatment, or seeking the membership's support.

97. The Union's failure to act was arbitrary, discriminatory, and in bad faith. It was motivated by Plaintiff's disability, his perceived sexual orientation, and his complaints about harassment, including harassment by Union officers. Because the Union let the thirty-day deadline pass, Plaintiff lost his right to grieve and arbitrate his suspension.

**H. Defendants' Retaliation Follows Plaintiff to New Employers**

98. In or about August 2026, Plaintiff relocated to Annandale, Virginia, near family and friends in the Washington, D.C. area, to rebuild his career.

99. Plaintiff applied for firefighter positions with Fairfax County Fire and Rescue Department and the Metropolitan Washington Airports Authority Fire and Rescue Department.

100. Plaintiff passed each employer's medical examination, psychological evaluation, and polygraph examination. Each of these employers' independent psychological evaluations found Plaintiff fit for firefighter duty.

101. After each prospective employer contacted the Milford Fire Department, its discussions with Plaintiff ended immediately.

102. Upon information and belief, Defendants, through Chief Moore, Assistant Chief Scime, or others acting at their direction, provided false or misleading negative information about Plaintiff to these prospective employers, including information about his disability, his treatment, his compelled examination, and his complaints and EEOC Charge, in retaliation for his protected activity.

103. Defendants' conduct has prevented Plaintiff from obtaining comparable employment as a firefighter and has damaged his professional reputation and earning capacity.

**COUNT I**
**DISABILITY DISCRIMINATION**
**VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101, ET SEQ.**
**(AGAINST CHARTER TOWNSHIP OF MILFORD)**

104. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

105. At all times relevant hereto, Plaintiff was an "employee" and the Township was an "employer" and "covered entity" within the meaning of the Americans with Disabilities Act, as amended by the ADA Amendments Act of 2008 ("ADA"), 42 U.S.C. §§ 12111(2), (4), (5).

106. Plaintiff is an individual with a disability within the meaning of 42 U.S.C. § 12102(1) because (a) he has a mental impairment that, when active,

substantially limits one or more major life activities, 42 U.S.C. § 12102(4)(D); (b) he has a record of such an impairment, including his 2025 residential treatment and FMLA-designated leave for his own serious health condition; and (c) the Township regarded him as having such an impairment.

107. Plaintiff is a "qualified individual" within the meaning of 42 U.S.C. § 12111(8). He has the training, licensure, and experience required for his position and was able to perform its essential functions, as confirmed by his August 2025 clearance to return to work without restrictions, his 2024 physical examination, his performance evaluations, and his commendation.

108. The Township discriminated against Plaintiff because of his disability, record of disability, and perceived disability, in violation of 42 U.S.C. § 12112(a), by, among other things:

a. Removing him from duty and barring him from the station on April 2, 2026;

b. Compelling him, as a condition of continued employment, to submit to a fitness-for-duty examination not required of comparable employees;

c. Threatening him with termination;

d. Placing him on unpaid leave on May 1, 2026, and depriving him of his wages; and

e. Constructively discharging him, or, alternatively, withholding his wages and excluding him from work indefinitely.

109. Each of these actions caused Plaintiff harm with respect to an identifiable term or condition of his employment. *Muldrow v. City of St. Louis*, 601 U.S. 346 (2024).

110. The Township's stated reason for its actions - concern for Plaintiff's fitness for duty - is pretextual. Plaintiff had been cleared to work without restrictions, had performed without incident, and had managed the March 30 incident appropriately. *Inter alia,* the Township acted on myths, fears, and stereotypes about firefighters who have sought behavioral health treatment.

111. As a direct and proximate result of the Township's unlawful conduct, Plaintiff has suffered the damages described herein.

112. As a result of Defendants' unlawful conduct toward Plaintiff, Plaintiff has suffered substantial economic and non-economic injuries and damages, past and future, including, but not limited to:

a. Loss of wages and other compensation, both past and future;

b. Loss of the value of benefits, both past and future;

c. Loss of earning capacity;

d. Loss of employment and career opportunities;

e. Non-economic damages including without limitation damages for

mental anguish, anxiety, stress, humiliation, embarrassment, and damage to reputation;

f. Other injuries and damages that become known through discovery.

113. Plaintiff also seeks equitable relief, including reinstatement to active duty (or, in the alternative, front pay in lieu of reinstatement), back-pay, front-pay, and other equitable relief the Court deems appropriate.

WHEREFORE, Plaintiff prays for judgment against Defendant Township in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with equitable relief, interest, costs, and attorney fees as allowed by 42 U.S.C. § 12205.

## COUNT II
## HOSTILE WORK ENVIRONMENT BASED ON DISABILITY
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12112
## (AGAINST CHARTER TOWNSHIP OF MILFORD)

114. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

115. The ADA prohibits employers from subjecting a qualified individual with a disability to a work environment permeated with discriminatory intimidation, ridicule, and insult because of disability.

116. Plaintiff is a qualified individual with a disability, a record of disability, and a perceived disability, as set forth above.

117. Chief Moore and other supervisory personnel subjected Plaintiff to unwelcome harassment because of his disability, including mocking slurred noises and garbled speech imitating a mentally impaired person, and repeatedly calling him "retard" and "weak" because of his Condition and his treatment for it.

118. The harassment was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment. It was perpetrated in large part by the Department's highest-ranking officer, which magnified its severity and left Plaintiff no meaningful avenue for complaint within the Department.

119. The Township is liable for the harassment because it was perpetrated by supervisors with authority over Plaintiff, culminated in tangible employment actions, and was known to the Township, which failed to take prompt and appropriate corrective action.

120. As a direct and proximate result of the Township's unlawful conduct, Plaintiff suffered damages described above, which are incorporated here.

WHEREFORE, Plaintiff prays for judgment against Defendant Township in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with equitable relief, interest, costs, and attorney fees as allowed by 42 U.S.C. § 12205.

## COUNT III
## UNLAWFUL MEDICAL EXAMINATION AND INQUIRY
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12112(d)(4)(A)
## (AGAINST CHARTER TOWNSHIP OF MILFORD)

121. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

122. The ADA provides that a covered entity "shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity." 42 U.S.C. § 12112(d)(4)(A).

123. Section 12112(d)(4)(A) protects all employees, whether or not they are disabled. *Kroll v. White Lake Ambulance Auth.*, 691 F.3d 809 (6th Cir. 2012).

124. The fitness-for-duty evaluation the Township required of Plaintiff is a "medical examination" within the meaning of § 12112(d)(4)(A) because it was to be conducted by a physician selected by the Department and was designed to reveal whether Plaintiff has a mental or physical impairment and the nature and severity of any such impairment.

125. The Township required the examination as a condition of Plaintiff's continued employment, and enforced that requirement by removing Plaintiff from duty, threatening termination, and stripping him of his pay when he did not submit.

126. The examination was not job-related and consistent with business necessity. The Township had no significant, objective evidence that Plaintiff was unable to perform the essential functions of his job or posed a direct threat to himself or others. Plaintiff had been cleared to return to work without restrictions in August 2025, had performed his duties without incident thereafter, and had responded to a single workplace confrontation initiated by a supervisor by removing himself, using approved sick time, and seeking care from his own provider.

127. On information and belief, the examination would be broader or more intrusive than necessary to address legitimate concern, and the Township did not limit its scope to Plaintiff's ability to perform the essential functions of his position.

128. As a direct and proximate result of the Township's unlawful conduct, Plaintiff suffered damages described above, which are incorporated here.

WHEREFORE, Plaintiff prays for judgment against Defendant Township in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with equitable relief, interest, costs, and attorney fees as allowed by 42 U.S.C. § 12205.

## COUNT IV
## RETALIATION AND INTERFERENCE
## VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C.

**§ 12203**
**(AGAINST CHARTER TOWNSHIP OF MILFORD)**

129. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

130. The ADA prohibits an employer from discriminating against an individual because he has opposed any act or practice made unlawful by the ADA or made a charge under the ADA, 42 U.S.C. § 12203(a), and from coercing, intimidating, threatening, or interfering with any individual in the exercise or enjoyment of any right granted by the ADA, 42 U.S.C. § 12203(b).

131. Plaintiff engaged in protected activity by, among other things:

a. Repeatedly complaining to command officers, including Chief Moore, before March 30, 2026, about harassment mocking his mental health, and objecting through counsel on April 6, 2026, to disability-based harassment and discrimination;

b. Objecting to, and declining to submit to, a medical examination that was not job-related and consistent with business necessity; and

c. Filing a Charge of Discrimination with the EEOC on April 27, 2026.

132. Defendants knew of Plaintiff's protected activity. The Township's May 1, 2026 letter expressly referenced Plaintiff’s claims of harassment.

133. In response to Plaintiff's protected activity, the Township took

materially adverse actions against him that would dissuade a reasonable employee from making or supporting a charge of discrimination, including:

a. Removing him from duty, locking him out of Department systems, and ordering a psychological examination on April 2, 2026, shortly after his complaints and his request for medical leave, and placing him on unpaid leave on May 1, 2026, four days after he filed his EEOC Charge;

b. Threatening him with termination and progressive discipline;

c. Continuing to bar him from the station and from performing his duties; and

d. Constructively discharging him.

134. The close temporal proximity between Plaintiff's protected activity and the Township's adverse actions, together with the Township's express reference to his harassment claims, establishes a causal connection.

135. The Township's retaliation continued after Plaintiff's separation. Upon information and belief, the Township provided negative information to Plaintiff's prospective employers, causing them to end the hiring process. Post-employment retaliation is actionable. *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997).

136. By conditioning Plaintiff's continued pay and employment on his submission to an unlawful medical examination, the Township coerced, threatened,

and interfered with Plaintiff's exercise of rights protected by the ADA, in violation of 42 U.S.C. § 12203(b). Chief Moore further coerced and intimidated Plaintiff and other employees in the exercise of their ADA rights by threatening that anyone who complained above him to Township personnel "won't work here anymore."

137. As a direct and proximate result of the Township's unlawful conduct, Plaintiff suffered damages described above, which are incorporated here.

WHEREFORE, Plaintiff prays for judgment against Defendant Township in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with equitable relief, interest, costs, and attorney fees as allowed by 42 U.S.C. § 12205.

**COUNT V**
**HOSTILE WORK ENVIRONMENT BASED ON SEX**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. § 2000e, ET SEQ.**
**(AGAINST CHARTER TOWNSHIP OF MILFORD)**

138. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

139. At all times relevant hereto, Plaintiff was an "employee" and the Township was an "employer" within the meaning of Title VII, 42 U.S.C. § 2000e(b), (f).

140. Title VII prohibits discrimination "because of . . . sex," which includes discrimination because of sexual orientation, *Bostock v. Clayton County*, 590 U.S.

644 (2020), and because of an employee's perceived failure to conform to sex stereotypes, *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989).

141. Chief Moore, supervisory personnel, and co-workers subjected Plaintiff to unwelcome harassment because of sex, including repeatedly calling him "faggot," "queer," "homo," and "pussy," and questioning whether he was gay and viewing "gay porn."

142. The harassment was sufficiently severe or pervasive to alter the conditions of Plaintiff's employment and create an abusive working environment.

143. The Township is liable for the harassment because it was perpetrated in part by the Fire Chief and other supervisors, culminated in tangible employment actions, and was known to the Township, which failed to take prompt and appropriate corrective action.

144. As a direct and proximate result of the Township's unlawful conduct, Plaintiff suffered damages described above, which are incorporated here.

WHEREFORE, Plaintiff prays for judgment against Defendant Township in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with equitable relief, interest, costs, and attorney fees as allowed by 42 U.S.C. § 2000e-5(k).

**COUNT VI**
**RETALIATION**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42**

**U.S.C. § 2000e-3(a)**
**(AGAINST CHARTER TOWNSHIP OF MILFORD)**

145. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

146. Plaintiff engaged in protected activity under Title VII by repeatedly complaining to command officers, including Chief Moore, about the sex-based slurs; by opposing sex-based harassment through his counsel's April 6, 2026 letter; and by filing his EEOC Charge on April 27, 2026, which expressly described the sex-based harassment.

147. Defendants knew of this protected activity and, four days after Plaintiff filed his Charge, placed him on unpaid leave, an action that would dissuade a reasonable employee from making or supporting a charge of discrimination.

148. The Township also retaliated against Plaintiff after his separation by providing negative information to his prospective employers, as alleged in Paragraphs 98 through 103.

149. As a direct and proximate result of the Township's unlawful conduct, Plaintiff suffered damages described above, which are incorporated here.

WHEREFORE, Plaintiff prays for judgment against Defendant Township in whatever amount the Court or jury determines to be fair, just, and adequate

compensation for the injuries and damages sustained, together with equitable relief, interest, costs, and attorney fees as allowed by 42 U.S.C. § 2000e-5(k).

**COUNT VII**
**RETALIATION AND INTERFERENCE**
**VIOLATION OF THE FAMILY AND MEDICAL LEAVE ACT, 29 U.S.C. § 2601, ET SEQ.**
**(AGAINST CHARTER TOWNSHIP OF MILFORD)**

150. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

151. At all times relevant hereto, Plaintiff was an "eligible employee" and the Township was an "employer" within the meaning of the FMLA, 29 U.S.C. § 2611(2), (4).

152. Plaintiff exercised his rights under the FMLA by taking leave from June through August 2025 for his own serious health condition, which the Township designated as FMLA leave.

153. Following Plaintiff's return, the Township, through Chief Moore and others, ridiculed Plaintiff for the condition for which he took FMLA leave, and ultimately removed him from duty, compelled him to undergo a fitness-for-duty examination, and stripped him of pay, expressly referencing the Township's response to his condition "in the past."

154. Plaintiff's use of FMLA leave was a motivating or determinative factor in the Township's adverse actions, in violation of 29 U.S.C. § 2615(a)(2).

155. In the alternative, on March 30 through April 2, 2026, Plaintiff notified the Township of a need for leave due to a serious health condition requiring treatment by a health care provider. Rather than designating and protecting that leave as required by 29 C.F.R. § 825.300, the Township used it as the basis for adverse action, interfering with Plaintiff's FMLA rights in violation of 29 U.S.C. § 2615(a)(1). Article 35 of the CBA measures FMLA leave over a rolling 12-month period. Having used 448 hours of FMLA leave in June through August 2025 against an entitlement of approximately 672 hours (12 weeks at an average 56-hour workweek), Plaintiff retained approximately 224 hours of FMLA leave on March 30, 2026.

156. The Township's violations were willful.

157. As a direct and proximate result of the Township's unlawful conduct, Plaintiff suffered damages described above, which are incorporated here.

WHEREFORE, Plaintiff prays for judgment against Defendant Township for lost wages, benefits, and other compensation, interest, an equal additional amount as liquidated damages under 29 U.S.C. § 2617(a)(1)(A)(iii), equitable relief including reinstatement (or, in the alternative, front pay in lieu of reinstatement), and costs and attorney fees under 29 U.S.C. § 2617(a)(3).

## COUNT VIII
## DEPRIVATION OF PROPERTY WITHOUT DUE PROCESS
## VIOLATION OF THE FOURTEENTH AMENDMENT, 42 U.S.C. § 1983
## (AGAINST CHARTER TOWNSHIP OF MILFORD, THOMAS MOORE,

**AND CHAD SCIME)**

158. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

159. At all times relevant hereto, Defendants acted under color of state law.

160. Under Article 10 of the CBA between the Township and IAFF Local 5481, the Township may discipline, suspend, or discharge Plaintiff, a non-probationary employee, only for just cause. Plaintiff therefore has a constitutionally protected property interest in continued employment and wages.

161. Defendants deprived Plaintiff of that property interest by suspending him without pay, effective immediately on May 1, 2026, without notice of the charges against him, an explanation of the evidence, or a meaningful opportunity to be heard, either before or promptly after the deprivation. Defendants labeled the suspension an "unpaid leave of absence," but no CBA provision authorizes involuntary unpaid leave, and the label does not change the deprivation.

162. Chief Moore and Assistant Chief Scime personally participated in the deprivation. Chief Moore, as the Township's final policymaker for Department personnel matters, made or ratified the decision, rendering the Township liable.

163. Plaintiff's right to pre-deprivation process was clearly established at the time. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985).

164. As a direct and proximate result of the Township's unlawful conduct,

Plaintiff suffered damages described above, which are incorporated here.

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, and punitive damages against Defendants Moore and Scime in their individual capacities, equitable relief, interest, costs, and attorney fees under 42 U.S.C. § 1988.

**COUNT IX**
**DENIAL OF EQUAL PROTECTION**
**VIOLATION OF THE FOURTEENTH AMENDMENT, 42 U.S.C. § 1983**
**(AGAINST CHARTER TOWNSHIP OF MILFORD AND THOMAS MOORE)**

165. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

166. At all times relevant hereto, Chief Moore acted under color of state law.

167. The Equal Protection Clause prohibits state actors from intentionally treating a person differently from others based on animus toward his actual or perceived sexual orientation or his mental disability, absent a rational basis. *See Stemler v. City of Florence*, 126 F.3d 856 (6th Cir. 1997); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985).

168. Chief Moore intentionally subjected Plaintiff to harassment because of his perceived sexual orientation and his mental health condition. He personally

taunted Plaintiff about being gay and mocked him as mentally impaired, permitted subordinate officers to direct slurs at Plaintiff, and suppressed complaints by threatening the job of anyone who reported above him. This conduct served no legitimate governmental purpose and was motivated by animus.

169. The Township is liable under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), because:

a. Chief Moore was the Township's final policymaker for personnel matters within the Department; and

b. The Township maintained a custom of tolerating harassment within the Department and of channeling all complaints to the Chief under threat of termination, of which it had actual or constructive knowledge.

170. Plaintiff's right to be free from intentional, animus-based harassment by a public employer was clearly established at the time of Chief Moore's conduct.

171. As a direct and proximate result of the Township's unlawful conduct, Plaintiff suffered damages described above, which are incorporated here.

WHEREFORE, Plaintiff prays for judgment against Defendants Township and Moore, jointly and severally, in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with punitive damages against Defendant Moore in his individual

capacity, equitable relief, interest, costs, and attorney fees under 42 U.S.C. § 1988.

## COUNT X
## DISABILITY DISCRIMINATION AND HARASSMENT
## VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT, MCL § 37.1101, ET SEQ.
## (AGAINST CHARTER TOWNSHIP OF MILFORD, THOMAS MOORE, CHAD SCIME, MARTIN COOK, JOSEPH BONISH AND IAFF LOCAL 5481)

172. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

173. At all times relevant hereto, Plaintiff was an employee, and each Defendant was an "employer" or an agent of an employer, within the meaning of the Persons with Disabilities Civil Rights Act ("PWDCRA"), MCL 37.1101 et seq. Under MCL 37.1201(b), an "employer" includes an agent of the employer, and Defendants Moore and Scime are individually liable for their own discriminatory conduct.

174. Plaintiff has a "disability" within the meaning of MCL 37.1103(d): a determinable mental characteristic that substantially limits one or more major life activities and is unrelated to his ability to perform the duties of his position, a history of such a characteristic, and/or being regarded as having such a characteristic.

175. Defendants discriminated against Plaintiff because of his disability, history of disability, and perceived disability, in violation of MCL 37.1202(1), by

removing him from duty, compelling him to undergo a fitness-for-duty examination, threatening him with termination, placing him on unpaid leave, and constructively discharging him.

176. Defendants further subjected Plaintiff to unwelcome harassment because of his disability, including Chief Moore's mocking of Plaintiff as mentally impaired and supervisory personnel's repeated references to Plaintiff as "retard" and "weak," which was sufficiently severe or pervasive to create an intimidating, hostile, and offensive work environment. The Township had actual notice of the harassment through the participation of its Fire Chief and failed to take prompt and adequate remedial action.

177. The Union is a "labor organization" under the PWDCRA. It discriminated against Plaintiff because of his disability, in violation of MCL 37.1204, by failing and refusing to represent him, investigate his complaints, or grieve the Township's actions, as alleged in Paragraphs 89 through 97.

178. As a direct and proximate result of the Township's unlawful conduct, Plaintiff suffered damages described above, which are incorporated here.

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with equitable relief, interest, costs, and attorney fees as allowed by MCL 37.1606.

## COUNT XI
## RETALIATION
## VIOLATION OF THE PERSONS WITH DISABILITIES CIVIL RIGHTS ACT, MCL § 37.1602
## (AGAINST ALL DEFENDANTS)

179. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

180. The PWDCRA prohibits a person from retaliating or discriminating against a person because that person has opposed a violation of the Act or made a charge or filed a complaint under the Act, and from coercing, intimidating, threatening, or interfering with a person in the exercise of rights under the Act. MCL 37.1602(a), (c).

181. Plaintiff engaged in protected activity by opposing disability discrimination and harassment through counsel on April 6, 2026, and by filing a Charge of Discrimination, dual-filed with the Michigan Department of Civil Rights, on April 27, 2026.

182. Defendants knew of Plaintiff's protected activity and, four days after he filed his Charge, placed him on unpaid leave and continued to threaten him with termination. Plaintiff's protected activity was a significant factor in Defendants' adverse actions.

183. After Plaintiff's separation, the Township, Chief Moore, and Assistant Chief Scime retaliated against him further by providing negative information to his

prospective employers, as alleged in Paragraphs 98 through 103.

184. The Union, Captain Cook, and Lt. Bonish retaliated against Plaintiff because of his protected activity, and aided and abetted the Township's retaliation, in violation of MCL 37.1602(a) and (b). They refused to represent him or grieve his suspension, and Lt. Bonish cancelled Union meetings to keep Plaintiff from attending, as alleged in Paragraphs 89 through 97.

185. As a direct and proximate result of the Township's unlawful conduct, Plaintiff suffered damages described above, which are incorporated here.

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with equitable relief, interest, costs, and attorney fees as allowed by MCL 37.1606.

**COUNT XII**
**SEX DISCRIMINATION AND HARASSMENT**
**VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL § 37.2101, ET SEQ.**
**(AGAINST CHARTER TOWNSHIP OF MILFORD, THOMAS MOORE, CHAD SCIME, MARTIN COOK, JOSEPH BONISH, AND IAFF LOCAL 5481)**

186. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

187. At all times relevant hereto, Plaintiff was an employee, and each Defendant was an "employer" or an agent of an employer, within the meaning of

the Elliott-Larsen Civil Rights Act ("ELCRA"), MCL 37.2101 et seq. Defendants Moore and Scime are individually liable as agents of the Township. *Elezovic v. Ford Motor Co.*, 472 Mich. 408 (2005).

188. The ELCRA prohibits an employer from discriminating against an employee with respect to the terms, conditions, or privileges of employment because of sex or sexual orientation. MCL 37.2202(1)(a). Discrimination because of sex includes harassment based on sexual orientation and on failure to conform to sex stereotypes, *Rouch World, LLC v. Dep't of Civil Rights*, 510 Mich. 398 (2022), and sexual harassment as defined in MCL 37.2103(i).

189. Defendants subjected Plaintiff to unwelcome conduct and communication because of sex and sexual orientation, including repeatedly calling him "faggot," "queer," "homo," and "pussy," and Chief Moore's questions about whether Plaintiff was gay and was viewing "gay porn," some of which was of a sexual nature.

190. The conduct substantially interfered with Plaintiff's employment and created an intimidating, hostile, and offensive work environment.

191. The Township is liable because it had actual notice of the harassment through the personal participation of its Fire Chief and other supervisors and failed to take prompt and adequate remedial action. Plaintiff also repeatedly complained of the harassment to command officers, and Chief Moore threatened the job of

anyone who complained to Township personnel.

192. The Union is a "labor organization" under the ELCRA. It discriminated against Plaintiff because of sex and sexual orientation, in violation of MCL 37.2204, by failing and refusing to represent him, investigate his complaints, or grieve the Township's actions, as alleged in Paragraphs 89 through 97.

193. As a direct and proximate result of the Township's unlawful conduct, Plaintiff suffered damages described above, which are incorporated here.

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with equitable relief, interest, costs, and attorney fees as allowed by MCL 37.2802.

**COUNT XIII**
**RETALIATION**
**VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT, MCL § 37.2701**
**(AGAINST ALL DEFENDANTS)**

194. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

195. The ELCRA prohibits a person from retaliating or discriminating against a person because the person has opposed a violation of the Act or made a charge or filed a complaint under the Act. MCL 37.2701(a).

196. Plaintiff opposed sex-based harassment through his counsel's April 6,

2026 letter and his April 27, 2026 Charge, dual-filed with the Michigan Department of Civil Rights. Plaintiff also repeatedly complained about the slurs to command officers, including Chief Moore.

197. Defendants knew of this protected activity and, four days after Plaintiff filed his Charge, placed him on unpaid leave and continued to threaten him with termination. Plaintiff's protected activity was a significant factor in Defendants' adverse actions.

198. After Plaintiff's separation, the Township, Chief Moore, and Assistant Chief Scime retaliated against him further by providing negative information to his prospective employers, as alleged in Paragraphs 98 through 103.

199. The Union, Captain Cook, and Lt. Bonish retaliated against Plaintiff because of his protected activity, and aided and abetted the Township's retaliation, in violation of MCL 37.2701(a) and (b). They refused to represent him or grieve his suspension, and Lt. Bonish cancelled Union meetings to keep Plaintiff from attending, as alleged in Paragraphs 89 through 97.

200. As a direct and proximate result of the Township's unlawful conduct, Plaintiff suffered damages described above, which are incorporated here.

WHEREFORE, Plaintiff prays for judgment against Defendants, jointly and severally, in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with

equitable relief, interest, costs, and attorney fees as allowed by MCL 37.2802.

**COUNT XIV**
**BREACH OF THE DUTY OF FAIR REPRESENTATION**
**PUBLIC EMPLOYMENT RELATIONS ACT, MCL § 423.201, ET SEQ.**
**(AGAINST IAFF LOCAL 5481)**

201. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

202. As Plaintiff's exclusive bargaining representative under PERA, the Union owed Plaintiff a duty to represent him fairly, in good faith, and without arbitrary or discriminatory conduct. *Goolsby v. City of Detroit*, 419 Mich. 651 (1984).

203. The Union breached that duty by failing to investigate, interview Plaintiff, take any statement, or file a grievance challenging his removal from duty, the compelled psychological examination, or his suspension without pay. It conditioned any action on Plaintiff's identifying "a specific provision" of the CBA, a task that belongs to the Union as exclusive representative. Its stated reason for refusing, that Plaintiff had lost no pay, became false on May 1, 2026. It then allowed the thirty-day grievance deadline under Article 11 of the CBA to lapse, extinguishing Plaintiff's contractual remedy.

204. The Union's conduct was arbitrary, discriminatory, and in bad faith. Its President and Secretary had personal conflicts of interest, its Secretary had

initiated the incident the Township relied upon, and its Secretary cancelled meetings to prevent Plaintiff from seeking the membership's support.

205. But for the Union's breach, Plaintiff's grievance would have been sustained, because the Township's actions lacked just cause and violated Articles 10, 17, 20, 26, and 36 of the CBA.

206. As a direct and proximate result of the Union's breach, Plaintiff lost his right to grieve and arbitrate his suspension and has suffered damages described above, which are incorporated here.

WHEREFORE, Plaintiff prays for judgment against Defendant Local 5481 in whatever amount the Court or jury determines to be fair, just, and adequate compensation for the injuries and damages sustained, together with interest and costs.

**COUNT XV**
**BREACH OF THE COLLECTIVE BARGAINING AGREEMENT**
**(AGAINST CHARTER TOWNSHIP OF MILFORD)**

207. Plaintiff incorporates by reference all facts and allegations elsewhere set forth in this Complaint.

208. Because the Union breached its duty of fair representation, Plaintiff may bring a claim directly against the Township for breach of the CBA.

209. The Township breached the CBA by, among other things: (a) suspending Plaintiff without pay without just cause, in violation of Article 10; (b)

imposing involuntary unpaid leave not authorized by Articles 17 or 36; and (c) compelling a psychological examination not authorized by Articles 20 or 26.

210. As a direct and proximate result of the Township's breach, Plaintiff has lost wages, health insurance, retirement contributions, seniority, and other benefits under the CBA.

WHEREFORE, Plaintiff prays for judgment against Defendant Township for all wages and benefits due under the CBA, together with interest and costs.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: October 19, 2026

Respectfully submitted,

DILLON & DILLON, P.L.C.

/s/ Paul J. Dillon
Paul J. Dillon (P46913)
9429 S. Main Street
Plymouth, MI 48170
(734) 455-9000
pjdillon@ddplc.net
Attorney for Plaintiff